UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.

| | |
|---|---|
| Mary Ellen Costa and Roberta Sullivan, Individually and on behalf of the members of Local 9 of the Service Employees International Union,<br><br>*Plaintiffs*<br><br>v.<br><br>The Service Employees International Union,<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## STATEMENT OF REASONS IN SUPPORT OF THE PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The Plaintiffs, Mary Ellen Costa and Roberta Sullivan, on behalf of themselves as officers and members of Local 9 of the Service Employees International Union (SEIU) and on behalf of the members of Local 9, seek injunctive relief against the Defendants. Ms. Costa is a Registered Nurse and Ms. Sullivan is a Licensed Practical Nurse, and both are employees of the Boston Medical Center. (VC: ¶ 2-3).[1] Prior to October 1, 2003 they and the other members of Local 9, were represented by Local 285 of the SEIU, and Ms. Costa and Ms. Sullivan were union representatives. (VC: ¶ 2-3). Ms. Costa was the Chairperson of the BMC RN unit or chapter, and Ms. Sullivan the Chairperson of the LPN unit or chapter, and each was elected to those positions by the nurses within their respective chapters. (VC: ¶ 2-3). As Chapter Chairpersons, they also served as members of the Local 285 Executive Board.

The nurses in these two bargaining units were represented at collective bargaining with the BMC by their Negotiating Committee, which consisted of the two Chapter Chairpersons, an RN

---

[1] References to paragraphs of the Verified Complaint are indicated by VC.

Chapter Vice-Chairperson, and a Recording Secretary, all of who were elected by the chapter memberships voting within their chapters, and by 11 other nurses from various areas of the BMC who were elected by the nurse members working in their respective areas. A representative from Local 285 was also on the Negotiating Committee. (VC: Background).

The collective bargaining agreement between the BMC and SEIU Local 285 governing the wages, hours and other terms and conditions of employment of the members of the BMC Nurse's Chapters was due to expire on September 30, 2003, and from July to September, the parties were engaged in negotiations towards a successor agreement. Some members of the BMC Nurse's Chapters had become increasingly dissatisfied with the quality of representation they were receiving from Local 285, and in September, 2003, began a campaign to secede from Local 285 and to establish an independent unaffiliated labor union. (Id.). The SEIU intervened, and upon realizing that the schism between the BMC Nurse's Chapters and the leadership of Local 285 was irreparable, the SEIU proposed to the BMC nurses continued affiliation with the SEIU as a separate local union, subsequently known as Local 9. (Id.).

The SEIU extended this offer to Mary Ellen Costa, and Roberta Sullivan, as representatives of the nurses in the Boston Medical Center RN and LPN Nurses Unit. (Id.). Ms. Costa and Ms. Sullivan determined that the appropriate course of action was to present the offer to the membership, and to let them vote on whether to accept it. (Id.). An election was held on September 15, 2003, and the nurses voted to have the Negotiating Committee pursue the SEIU's offer. (Id.).

The Negotiating Committee met with SEIU representatives Larry Fox and Carolyn McCullough, and negotiated the "Agreement to Establish an SEIU Local for Nurses at Boston Medical Center" (hereafter referred to as The Local 9 Agreement), provided among other things, that the SEIU President would issue a Charter upon the Committee's request, that th SEIU would approve

2

temporary bylaws drafted by the Committee provided they were consistent with the SEIU Constitution and Bylaws, and that the Committee would recommend candidates for appointment as Interim Officers. [(VC: ¶ 6-7); Exhibit A].[2] The Committee and the SEIU representatives also agreed that they would recommend themselves as interim officers, and that the SEIU President would appoint the Committee members, foe a period of no less than one year. (VC: ¶ 8-9).

The SEIU's attempts to avoid this Agreement began almost immediately after the membership ratified it on September 29, 2003. Although the Agreement stated the Charter would be issued at the request of the Committee, the Committee's requests were met by excuses. Larry Fox told Ms. Costa, that before a Charter could be issued, the Executive Board had to approve the Agreement even though Fox had said during the negotiations that such approval had been obtained. (VC: ¶ 12). Fox then told Ms. Costa the Charter couldn't be issued until there were bylaws in effect, so the Negotiating Committee, which was being pressured by the imminent expiration of the collective bargaining agreement, decided to accept the SEIU's earlier offer to use sample bylaws from the SEIU. (VC: ¶ 13-14). Then Mr. Fox began to pressure the Negotiating Committee to wait until after the collective bargaining agreement was finalized and ratified with Local 285 as the bargaining agent. (VC: ¶ 14). When the Committee refused, and insisted upon the Charter on October 1 after the collective bargaining agreement had expired, Fox told the Committee that the Charter couldn't be issued without President Stern's signature, but no one knew where he was. (VC: ¶ 16).

Finally, after Ms. Costa impressed upon Mr. Fox that the delay in issuing the Charter would delay and jeopardize the collective bargaining agreement, and the increased wages and benefits under that agreement, SEIU President Stern faxed the letter establishing SEIU Local 9 as the representative of the nurse units at the Boston Medical Center. (VC: ¶ 16-17: Exhibits B and C).

---

[2] Exhibits referred to in this statement are the Exhibits attached to the Complaint.

3

In the letter, President Stern also appointed Ms. Costa as the Interim President and Ms. Sullivan as the Interim Secretary Treasurer of Local 9 and the rest of the Negotiating Committee as the Interim Executive Board, as agreed during the negotiation of the agreement, but limited the appointment to three months contrary to the agreement that the appointments would be effective for at least one year. (VC: ¶ 8, 9 and 17). President Stern also included a set of interim bylaws, but in these bylaws and in the letter itself, reserved to himself the right to decide when local elections could be held. Although the Negotiating Committee was troubled by these variations from the Agreement, they didn't yet attribute them to any bad faith on the part of the SEIU. (VC: ¶ 17-19).

With the Charter finally in place, the Committee and the Boston Medical Center concluded bargaining, and reached a final agreement contingent upon the ratification of the membership.

The Negotiating Committee, now the Interim Officers, then began the process of printing, reproducing, distributing and explaining the collective bargaining agreement changes to the membership, in anticipation of the ratification vote. In the meantime, the interim officers prepared a draft of a Constitution and Bylaws for their local. (VC: ¶ 20). Their draft was presented to the membership at the same time and in the same manner as the tentative collective bargaining agreement, by President Costa and Secretary Treasurer Sullivan, and in a vote held on October 15, both were accepted by the membership. (VC: ¶ 27).

After the tentative agreement and the draft Bylaws were distributed, a group of nine nurses announced their opposition to the bylaws. (VC: ¶ 10; Exhibit E). At about the same time, the SEIU, through Carolyn McCullough, contacted the interim officers and echoed the sentiments of the nine opposition nurses, but never condemned either the process or the substance of the draft bylaws until after the membership had voted to accept them. (VC: ¶ 22, 23-26).

The Bylaws were subsequently rejected by the SEIU on procedural and substantive grounds,

4

but instead of directing the interim officers to prepare and submit a different set, the SEIU took over the process. (VC: ¶ 31; Exhibit J). Carolyn McCullough and John Ronches, were assigned by President Stern to administer the creation of new Local 9 Bylaws. (VC: ¶ 35, 39-40). Ms. McCullough subsequently appointed a new Bylaws Committee which included a majority of the dissident nurses and their supporters. (VC: ¶ 35-37; Exhibit M). She also ordered President Costa to refrain from any further communication with the Local 9 membership without her prior approval, and decided where and when the new Committee would meet. (VC: ¶ 36; Exhibit L). When they did meet, the meetings were directed by McCullough and Ronches, and it was apparent to President Costa and Secretary Treasurer Sullivan that the course of the meeting had been predetermined in a prior meeting with just the Opposition Nurses. (VC: ¶ 39-41). Ms. McCullough and Mr. Ronches lead the committee to propose a local union run by a non-member, with a labor union background, and these International representatives assured the committee members that they would help the local find such a person. (VC: ¶ 39-41; Exhibit N). At this point, the Interim Officers and Executive Board knew that for whatever reason, the SEIU was not dealing with them in good faith, and was determined to take control of the affairs and operation of the Local 9. (VC: ¶ 42).

In light of this attempt to manipulate the Bylaws and the operation of the affairs of the local, the officers reconvened their Bylaws committee and moved forward with the process of creating a local constitution and bylaws. (VC: ¶ 42-43). They took the draft that had been rejected by the International, and modified it in accordance with the letter rejecting the initial draft from president Stern which listed the problems with that draft. (VC: ¶ 42). They published this modified draft among the membership, held membership meetings to review and discuss the modified draft with the membership, giving the membership the chance to propose modifications from the floor. (VC: ¶ 42). They also invited the membership to propose suggested modifications on the Local 9 website. (VC: ¶

5

43). The membership subsequently voted to accept the modified draft, and it was sent to the International for review and approval on December 17, 2003. (VC: ¶ 44-45). The International to date has refused to review and approve the modified draft. (VC: ¶ 45).

On December 10, 2003 Local 9 initiated charges against Ms. McCullough under the SEIU Constitution and Bylaws, for selecting the Bylaws committee and by attempting to control President Costa's communications with the membership, but the International refused to take up the charges, stating that as an employee of the International, Ms. McCullough wasn't subject to its Constitution and Bylaws. (VC: ¶ 46, 53: Exhibits P and U).

On December 26, 2003, Lorraine Riley and Eileen Ridge, two of the Opposition Nurses, filed charges against President Costa and Secretary-Treasurer Sullivan, accusing each of multiple violations of the SEIU Constitution and Bylaws. (VC: ¶ 49; Exhibit Q).

The procedure for the determination and resolution of charges initiated against local union officers is set forth in the SEIU Constitution and Bylaws, and includes certain safeguards to protect members' from frivolous charges and to assure the accused of a full and fair hearing. (Exhibit D, Art. XVII, §§ 1 and 2, pp. 32-34). Charges must be in writing, and must specify the events or acts on which the charges are based, and must be served on the accused through the local union secretary at least ten days before any hearing. [Exhibit D, Art. XVII, §§ 1 and 2(a)]. The local union executive board, or its appointees, serves as the trial body, to which the accused and the charging party present their cases. [Exhibit D, Article XVII, § 2(b)]. The trial body reaches a judgment, and if it finds that the charges have been sustained, may determine and impose disciplinary action. (Exhibit D, Art. XVII, §§ 1 and 2, pp. 32-34). The Constitution also states that the accused shall be afforded a full and fair hearing, shall have the opportunity to appear and to call witnesses, and may select another member as his or her representative, or if a local constitution provides, an attorney. [Exhibit D, Article XVII, § 2(b)].

6

The Local 9 Officers and Executive Board members appointed a neutral Local 9 member with legal experience to select a trial board from among the membership, and to make arrangements for a hearing. (VC: ¶ 50-51; Exhibits R and S). The SEIU however refused to allow the local to conduct the proceedings, and assumed jurisdiction of the dispute under Article XVII, § 2 (f) which states that the International President may hold a hearing and decide the dispute. (Exhibit D, p. 34).

On January 6, 2004, the International President issued a notice of hearing designating Christine Boardman, a member of his Executive Board, to serve as a Hearing Officer. (VC: ¶ 52; Exhibit T). He directed Ms. Boardman to hold hearings on pending issues and to report to him with recommendations.

On January 13, 2004 the Local 9 Executive Board submitted a written request to the International President for specific information regarding the charges and allegations against them. [(VC: ¶ 534; Exhibit V)]. The International denied their request. (Exhibit X-1, p.1).

The Local 9 Officers and Executive Board members nevertheless appeared on January 26, for the hearing, with their counsel, James F. Norton, who had since become a member of the Local 9 in accordance with the provisions of Article III, § 3 (a) and (b) of the International's Constitution and Bylaws. (VC: ¶ 60). The hearing officer, Christine Boardman, and SEIU counsel, Norman Gleichman, who was seated with Ms. Boardman at the hearing officers' table, refused to permit Mr. Norton, who also served as counsel to Local 9 from attending or participating in this hearing. (Id.) All other SEIU Local 9 members were invited and permitted to attend and participate. (Exhibit X-1). When Mr. Norton refused to leave, Ms. Boardman and Atty. Gleichman dismissed the Local 9 complaints against the International Union. (VC: ¶ 60).

The charges filed against President Costa and Secretary-Treasurer Sullivan by members Riley and Ridge, and the complaints raised by the unidentified members against the officers, were

7

postponed until the evening. (VC: ¶ 60). The Local 9 officers and executive board members appeared again with Mr. Norton, and Mr. Gleichman contacted the Boston Police to have Mr. Norton removed from the meeting. (VC: ¶ 61). The Local 9 officers and board members left in protest and the hearing was conducted in their absence. (VC: ¶ 60). On January 30, President Stern on the basis of a preliminary report from Ms. Boardman and Mr. Gleichman, removed the officers and board members from office and replaced them with the Opposition Nurses, who represented the interests of the International, and so far as anyone knows, the interests of only ten Local 9 members.

## ARGUMENTS

### I.   The Standard for Temporary Restraining Orders and Preliminary Injunctions

In order to succeed in a request for injunctive relief, the Plaintiffs must show that they are likely to succeed on the merits of their claims, that if injunctive relief is not granted the Plaintiffs will suffer irreparable harm, that the Plaintiffs will suffer a greater hardship if an injunction does not issue than the Defendant will if it does, and the effect of the court's action on the public interest. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 220 (1st Cir., 2003); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir.1996.

**A.   The Plaintiff's are likely to succeed on the merits of their claims.**

**1.   The SEIU Violated the Local 9 Agreement**

Suits for violations of contracts between labor organizations are enforceable under § 301 of the Labor-Management Relations Act. 29 U.S.C. § 185.

The Agreement to Establish an SEIU Local for Nurses at the Boston Medical Center (The Local 9 Agreement, Exhibit A) was a contract between the SEIU and "a committee of the Boston

8

Medical Center Nurses chapters." (Exhibit A). The members of this Committee were nurses employed by the Boston Medical Center. The BMC Nurses' Chapter elected the Committee members to negotiate a collective bargaining agreement with the Boston Medical Center covering the wages, hours and other conditions of employment of the member nurses. This Committee therefor was a labor organization as that term is defined in 29 U.S.C. §152 (5)[3], and the Local 9 Agreement, a contract between labor organizations, within the meaning of 29 U.S.C. § 185.

The Local 9 Agreement is enforceable by the members of Local 9 who were the beneficiaries of that contract. Wooddell v. International Brotherhood of Electrical Workers, Local 71 502 U.S. 93, 100-101 (1991) (§ 301 extends to suits on union constitutions brought by union members); Smith v. Evening News 371 U.S. 195, 200-201 (1962), (§ 301 extends to suits to on a collective bargaining agreement brought by union members who are beneficiaries of such agreement.)

In the negotiation of Local 9 Agreement (Exhibit A), the SEIU and the Committee reached the following agreements:

1.  The Committee would recommend to the SEIU that members of the Committee would be appointed as the interim officers and executive board members, and that the appointments would be for a period of no less than one year;

2.  The president of the SEIU would issue a charter establishing a new local union for these nurses, at the request of the Committee;

3.  The SEIU would approve temporary bylaws drafted by the Committee provided they were consistent with the SEIU Constitution.

The SEIU breached this contract by failing to appoint the members of the Committee as interim officers and executive board for a period of no less than one year

---

[3] The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work. 29 U.S.C. §152 (5)

9

by appointing the members for a period of only three months, and by removing them from office on January 30, 2004.

The SEIU also violated the contract with the Committee by refusing to issue the charter at the request of the Committee, on the grounds that the Committee had not yet created bylaws approved by the SEIU. (VC: ¶ 13). During the negotiation of the agreement, the SEIU never proposed and the parties never discussed that a charter wouldn't be issued until the Committee had created bylaws. (VC: ¶ 13). The Local 9 Agreement was ratified by the membership on September 29, 2003, and the Committee immediately requested the charter. (VC: ¶ 11-16). The SEIU offered several excuses as to why the charter could not or would not be issued, including the absence of bylaws. (VC: ¶ 11-16). Since the resolution of the collective bargaining agreement with the BMC was dependent upon the Charter, the Committee agreed to use what the SEIU representative Larry Fox had called "sample" bylaws, which unbeknownst to the Committee, included a provision reserving to the SEIU President the power to determine when elections would be held. The power to decide when regular elections shall be held is not reserved to the International in the SEIU Constitution and Bylaws, and was never proposed by the SEIU or discussed by the parties during the negotiation of the Local 9 Agreement. (VC: ¶ 11-16).

Finally, the SEIU violated its agreement with the Committee by refusing to review and to approve the Constitution and Bylaws sent to the International on December 17, 2003. The International agreed to approve temporary bylaws drafted by the Committee provided that they were not inconsistent with the SEIU Constitution and Bylaws. (VC: ¶ 7; Exhibit A). In accordance with this provision, the International should have promptly

reviewed the December 17, 2003 submission, and since it is not inconsistent with the SEIU Constitution and Bylaws, approved it at least on a temporary basis.

2. **The SEIU Violated its Constitution & Bylaws and the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 402(h), 411(a)(1), 411(a)(5) and 462.**

The SEIU Constitution and Bylaws is a contract between labor organizations, enforceable by local union affiliates and their members under § 301. (29 U.S.C. §185) Wooddell v. IBEW, Local 71, 502 U.S. 93, 99-102 (1991), Plumbers and Pipefitters v. Plumbers and Pipefitters, Local 334, 452 U.S. 615, 624 (1981) The SEIU has violated its Constitution and Bylaws, and several provisions of the Labor-Management Reporting and Disclosure Act, by the following actions:

1. Usurping the Local's power to create its own constitution and bylaws and failing to review and to approve the proposed Constitution and Bylaws submitted for approval on December 17, 2003;

2. Removing President Costa, Secretary-Treasurer Sullivan and the members of the Local 9 Executive Board from their offices without providing them with specific written charges, a reasonable opportunity to prepare their defense, and a full and fair hearing;

3. Excluding a member from the hearings of January 26, 2004;

4. Imposing a trusteeship without following the procedural requirements set forth in the Constitution and Bylaws.

(a). **The SEIU violated Article XV, § 3 by usurping Local 9's authority to create their own Constitution and Bylaws subject to International approval, and by failing and refusing to review and approve the Constitution and Bylaws submitted by Local 9.**

Article XV of the International Constitution is entitled **DUTIES OF LOCAL UNIONS**. Article XV, section 3 provides that local constitutions and bylaws must be

11

submitted to the International for approval, and further that the International's Constitution and Bylaws shall supercede any local constitution and bylaws whether or not the local documents have been approved. (Exhibit D, p. 27).

Since local unions must submit their Constitutions and Bylaws to the International for approval, the duty and authority to create a Local Constitution and Bylaws must lie initially with the Local Union. Local 9 submitted a proposed Constitution and Bylaws to the International for approval on October 15, 2003. (VC: ¶ 27-28). The International did not approve this first submission, and in a letter from President Stern described the deficiencies in the Local's submission, and assigned International representative, Carolyn McCullough, to work with the Local to create an acceptable Constitution and Bylaws for Local 9. (VC: ¶ 31; Exhibit J). The Local 9 officers attempted to work with Ms. McCullough, and suggested a process for establishing a new Bylaws Committee and creating new Bylaws. (VC: ¶ 33-34; Exhibit K). Ms. McCullough didn't work with the Local officers, she took over the process. Ms. McCullough rejected the officers' suggestions, ordered the President to refrain from any communication with Local 9 members about this issue without her approval, selected and appointed a new Bylaws Committee, scheduled the meetings of the Committee and notified the members of such meetings and directed those meetings with John Ronches, an assistant to the International Secretary-Treasurer. (VC: ¶ 33-41; Exhibits L - N). These actions violated the rights of Local 9 and its members to establish and select and appoint members to their committees and to prepare a Constitution and Bylaws for submission to the International for approval.

The SEIU's refusal to approve a proposed Constitution and Bylaws does not disqualify the Local from creating and proposing another. There is no provision in the

International Constitution and Bylaws for the International to usurp the Local Union's role in this process, other than the trusteeship provisions which are addressed below, and its actions in doing so violate that Constitution and Bylaws.

The International has also violated its obligations under Article XV, § 3 of its Constitution and Bylaws by failing and refusing to review the Constitution and Bylaws submitted on December 17, 2003. The power to approve the constitution and bylaws of the local unions must include the duty to promptly review submissions in good faith, and to issue approval where the proposed submission does not conflict with, and is not inconsistent with, the International's Constitution and Bylaws. The International has had Local 9's proposed Constitution and Bylaws since December 17, has refused to even review them.

**(b).** **The SEIU violated Article XVII of its Constitution & Bylaws, and § 411 (a)(5) of the LMRDA, by its removal of the Local 9 officers and board members.**

The International's Constitution and Bylaws states that a member cannot be disciplined without the procedural safeguards set forth in Article XVII, **TRIALS AND APPEALS**. These safeguards include:

1. Written charges from the accuser(s) that specify the events or acts which the charging party believes constitutes a basis for the charges, and stating the provisions of the Constitution and Bylaws allegedly violated;

2. Service of the charges through the Local Secretary at least ten days before a hearing;

3. Opportunity to appear and to be heard with or without witnesses and with or without representation by at least a member of the local;

4. A full and fair hearing.

[SEIU Constitution and Bylaws, Article XVII, § 2(a) and (b).]

13

Section 411 (a)(5) of the LMRDA provides:

**§ 411. Safeguards Against Improper Disciplinary Action**
(a) No member of any labor organization may be fined, suspended, expelled or otherwise disciplined, except for non-payment of dues by such organization or by any officer thereof, unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; ©) afforded a full and fair hearing.

On January 30, 2004, SEIU President Stern removed Mary Ellen Costa, Roberta Sullivan, Joanne Vitti, Joseph Harter, Mary Ellen Foley-Perry, Eileen Ridge, Robert Hossack, Kathleen Barry, Mary Sullivan, Vicki Sutherland, Aixa Gonzalez, Judy Maloney, Donna Ellis, Don Johnstone, and Donna Brennan from their positions as officers and members of the Local 9 Executive Board, without observing the requirements of § 411(a)(5) or the SEIU's Constitution and Bylaws. The events leading to these removals follow.

On December 23, 2003, SEIU President Stern faxed a memo to SEIU Local 9 stating that because of complaints he had received from members, he intended to hold a hearing into the "internal needs" of Local 9 pursuant to his powers under Article VIII, § 7(g) of the SEIU's Constitution and Bylaws. (Exhibit P; Exhibit D, p.16).

On December 26, charges were filed against President Costa and Secretary-Treasurer Sullivan. Local 9 began the process of assembling a trial body as provided in Article XVII, § 2. (Exhibit S).

On January 6, 2004, President Stern issued an order removing the proceedings from Local 9 and asserting his jurisdiction of the charges pursuant to his powers under Article XVII, § 2(f). (Exhibit T, Exhibit D p. 34). He ordered an "internal needs" hearing be held, appointed Christine Boardman, a member of the International Executive Board,

14

as Hearing Officer, and directed her to make recommendations concerning the charges filed against President Costa and Secretary Sullivan.

In his January 6 order, President Stern stated that he had received complaints from members of Local 9 accusing the Officers and Executive Board members of:

1. Failing to widely distribute draft bylaws;

2. Attempting to restrict members' eligibility to run for local office;

3. Ridiculing members expressing opposition to the draft bylaws;

4. Creating a climate of fear of retaliation for expressing views different from those of the interim leadership;

5. Failing to maintain secrecy of the ballot in the vote approving the constitution and bylaws;

6. Failing to educate the membership or invite the opinion of the membership on the proposed constitution and bylaws.

President Stern also noted that Local 9 had accused him of breaching the Local 9 Agreement by appointing the Interim Officers for only three months instead of for one year. (Exhibit T). He ordered that these accusations also be addressed at the hearing.

President Stern ordered Ms. Boardman "to examine and make a report and recommendation" on these issues and others including whether the officers and board members should be removed from their positions. (Exhibit T).

President Costa, Secretary-Treasurer Sullivan and the members of the Executive Board never received written notice specifying the acts and events which formed the basis for the allegations asserted against them by President Stern. On January 9 and again on January 20, the Executive Board requested President Stern to identify the members that had made complaints, and to provide information about the basis of such complaints. (VC: 54 and 57; Exhibits V and W).These requests were denied by Christine Boardman

15